I now call the next case of Anthony Troutman v. Seaboard Marine of Florida. Good morning. May it please the Court, Philip Parrish on behalf of the appellant, Anthony Troutman. The issue on appeal in this 905B action is whether the open and obvious nature of a dangerous condition on a bed... This is Judge Carnes again. Maybe it's my phone, but could you speak up just a little bit? I'm having trouble hearing you. Certainly. Thank you. I'll pick up the line. The issue is whether the open and obvious nature of a dangerous condition is a complete bar not only to a failure to warning claim, but also to a claim for negligent turnover of a vessel with respect to the same open and obvious danger. This court in Lemon v. Bank Lines, and I say this court, it was a pre-Bonner Fifth Circuit case, Lemon v. Bank Lines said, however, in light of Cindy de los Santos, considerations of the stevedore's awareness of and degree of control over a dangerous situation are irrelevant when the existence of the dangerous condition is attributable to the negligence of the shipowner. The court went on to say, the Supreme Court clearly established that the ability of a longshoreman to recover cannot turn on who was in the best position to recognize and remedy a dangerous condition when that condition was created by a vessel owner who knew or should have known of its existence prior to the stevedore's operations. And that's what we have in this case, which is a failure of the vessel to have a railing, or as it's sometimes been called on the record, a rope fence available and in place to preclude an injury such as what occurred to Mr. Troutman who fell six or eight feet below as a result of that railing not being there. Now what this court in Lemon was referring to there was footnote 22, in part footnote 22 in Cyndia v. de los Santos, where the Supreme Court said, we agree with the Court of Appeals that the shipowner may not defend on the ground that Santos should have refused to continue working in face of an obviously dangerous winch, which his employer, Seattle, was continuing to use. The district court erred in ruling otherwise since the defense of assumption of risk is unavailable in section 905B litigation. Now it's our position that the district court, after finding that the lack of that railing was open and obvious and thus holding that the ship had not breached the duty to warn of latent defect portion of the turnover duty, then basically collapsed the second turnover duty, which is the duty to turn over the vessel in the first place without a dangerous condition into a single duty and that that is contrary to Cyndia and contrary to this court's opinion in Lemon. This is Judge Newsom. Can I ask you a quick question about Lemon? I think Lemon is the case that you brought to us in a 28-J, I think. Yes. And so I suppose that this post-split decision is not technically binding on us, but hasn't the Fifth Circuit subsequently come to the conclusion that Lemon was abrogated by Howlett? Well, so it suggested that it was no longer good law in light of Howlett. I will tell you that West's law does not show that it's been overruled, but even if it had been overruled by the Fifth Circuit, and I want to address Kirksey because I think that the Kirksey analysis is wrong based upon maritime law and based upon what the Supreme Court did and did not do in Howlett. Kirksey did note that Howlett addressed solely the duty to warn and did not address the duty to turn over the vessel without a dangerous condition in the first place. The Supreme Court said that twice in Howlett. At 94, it said, this case requires us to define the circumstances under which a ship owner must warn of latent dangers in the cargo stow or cargo area. Then at page 99… So just quickly, I'm sorry. This is the danger, I suppose, of you having to do this telephonically, but I just jumped on West's law to check it out, and in fact, Lemon does have a big fat red flag next to it showing that it's been abrogated. All right. That doesn't show in my printed out version, but in any event, be that as it may, it's been abrogated in the Fifth Circuit. The Fifth Circuit cannot abrogate it as to this circuit. But I assume that the Fifth Circuit's conclusion that it had been abrogated by Howlett might or might not be persuasive to us as to what Howlett does or doesn't mean. It could. I mean this court, well, although yes, this court could look at Howlett, look at Kirksey, and come to the determination as the Fifth Circuit did that Howlett did that. Now I think the court would be wrong to do so, and let me explain why. So even Kirksey acknowledged that Howlett addressed only the duty to warn. It then went on to say that given its clear language strictly limiting the vessel's turnover duty to warn to latent defects and dangers, it makes no sense to say that the vessel is nevertheless liable to the longshoremen for a breach of the duty to turn over a safe ship based on an obvious defect against which it had no duty to warn. Well, but that analysis disregards the distinct purposes between the duty to warn and the duty not to turn over the vessel in a dangerous condition in the first place. Let's take a hypothetical situation that's very extreme I would admit, but let's say that the vessel is turned over with tigers roaming the deck. That's clearly an obvious and open danger, but you couldn't say that the vessel had no duty not to do that. And the reason I cited this court's decision last week in Carroll v. Carnival as they noticed itself on all authority is that it addressed, albeit not in a 905B action, but in a maritime case, a negligence case, it addressed why the district court in that case had erred in conflating the purpose of a duty to warn claim with the purpose of a negligent maintenance claim. Now in that case it was negligent maintenance because it was a passenger on a cruise line. In this case it's negligent turnover because we have a longshoreman, and under CINDIA there are two distinct turnover duties. One's the failure to warn and one's the turning over a vessel in a negligent condition with respect to its equipment. And in curtsy the court collapsed those two things, whereas in Lemon I think this, again, Lemon I think correctly analyzes CINDIA and Hallett doesn't change that because Hallett did not address the separate duty. And again, under the analysis that was set forth by this court last week, simply because there's no duty to warn unless it's a latent condition does not mean that you can just turn it over and say, well, then there would be no turnover duty at all because you would be saying, hey, if it's a patent dangerous condition we have no duty to warn because it's not latent. And we have no duty not to turn it over that way because, well, curtsy says that we're going to extend Hallett so far to suggest that if it's in fact open and obvious under the duty to warn, then there can never be a case where the vessel can be held liable for turning it over no matter how dangerous the condition is. Legally I would suggest the curtsy analysis is incorrect. In fact, I would direct this court's attention to Judge Jordan's opinion for the court last week in Carroll v. Carnival, which I think really goes to that issue. And it goes back to the – Well, that's a different account. So this is Judge Carnes. That's a very different – we're talking about tort liability to somebody on a cruise ship. Here we're talking about a specific statute. My understanding is the Supreme Court had indicated that – not that it's only obvious latent defects, but the turnover duty at its heart is you turn it over in a way, and I'm going to quote, that an expert and experienced stevedoring contractor mindful of the dangers he should reasonably expect to encounter arising from the hazard will be able by the exercise of ordinary care to carry on cargo operations with reasonable safety. What I thought was the problem for you here is it's one thing if you've got somebody, a high wire act, where you're looking down and it looks pretty obvious that if you fall it's going to be really bad, and that would seem like it's obvious. But your point is, you know, we can't operate that way because it's so dangerous. But my understanding in this case was that the typical way these ships were loaded would be load from the bottom. And when you load from the bottom and then you load the top at the end, that there was no danger because that abyss, that hole had been covered, and that was the typical standard way to do it. In this case, the supervisor, not the ship, but the supervisor of your client made a decision not to do it that way, and my concern is at that point that's on them, that's not on the vessel. Tell me why I'm wrong in that analysis. Well, I think it goes back to, I mean, the stevedore, like Santos, I think that the vessel owner under footnote 22 in Cyndia cannot defend on the ground that Santos, and I would say or his employer, should have refused to continue working in the face of an obviously dangerous condition. Well, they didn't have to refuse. I mean, his supervisor could have loaded it a different way. Well, I think there's some testimony that the trailers that were going in the lower bay were not ready yet. We know that Troutman was ordered by his supervisor to unlash the trailers in the upper bay. Responsibility of the vessel or the responsibility of the stevedoring operation? Well, so, and this gets into somewhat the duty to intervene, which is they don't have a duty to intervene except under very circumscribed conditions, and we don't have a duty to intervene claim here anymore. That was summaried out, and we're not claiming they had a duty to intervene under these circumstances, but if the vessel owner doesn't typically have a duty to intervene here, and, in fact, an affidavit from the vessel owner said, well, nobody from our ship was there at that moment, well, then that puts all the more need for the vessel owner to turn over the vessel with the rope fence in place rather than turn it over without it in place. They can't know and aren't charged with knowing precisely how it's done on a given occasion. In this occasion, it was done for whatever reason, and it seemed like the trailers weren't available. But that sounds, this is Judge Newtham, that sounds like you're basically making the vessel the insurer of the stevedore. No, not insurer, because it's the vessel's property here, their safety netting that was not provided. And I would point out that in Cyndia, on the same page that Judge Carnes just quoted from, the court went on to say the ship owner thus has a duty with respect to the condition of the ship's gear, equipment, tools, and workspace to be used in the stevedoring operations. Now, the duty, and getting back to Carol, it's the same duty that applies here. 905B doesn't define what negligence means in the court in Cyndia and how it recognized that, so they are using essentially common law. We don't have a rigid statutory definition that has to be followed. They apply essentially common law principles. And they're indicating that it's not a situation where you can go to the old rule of assumption of risk or contributory negligence on the part of the longshoreman or the stevedore to say that that completely absolves the vessel owner of the duty. Our case is the moment it turned it over without that railing, that that's a negligent condition. And that Mr. Troutman, an experienced stevedore, even if you use the language from the first part of that quotation from Cyndia, he thought he could do it. He understood there was a danger if he fell, but he thought he could do it without falling. Well, but he couldn't. And so in that instance, I think there's a question of fact here as to whether him exercising ordinary care, he nevertheless could not properly perform his functions. And you can't put it on him to say, hey, to his employer, go get me this railing because in Cyndia, paragraph 22, I mean rather footnote 22, it said you can't utilize the assumption of the risk as a defense. All these go to comparative negligence. Counsel, your time has expired. All right. If there are no further questions, I'll continue upon rebuttal. Thank you. May it please the Court, Robert Blank on behalf of the appellee. The issue that's been presented in this case for purposes of appeal is that the lower court either misapplied the law or failed to take into account evidence that was presented that would raise a material issue of fact in dispute and preclude summary judgment. It's the position of the appellee that the court applied the applicable law as required by Cyndia and that there is an absolute dearth of any fact created by the plaintiff at the time the motion for summary judgment was filed. In opposition to the defendant's motion for summary judgment, it was the plaintiff's burden to provide evidence not that a possible hazard existed, but that the plaintiff, an experienced longshoreman, would not, by the exercise of reasonable care, be able to carry on cargo operations with reasonable safety to himself. The plaintiff failed to provide the trial court with any evidence whatsoever to support that the condition complained was either not open and obvious to him nor that he could not perform his duties with reasonable safety as determined by the trial court by waiting until cargo was loaded in Bay 32, which upon doing so would have obviated any concerns about his falling. In fact, the only evidence that was supplied to the trial court by plaintiffs in their opposition papers was an affidavit by the plaintiff which did not dispute nor discuss the open and obvious nature of the condition nor even address the issue of his ability to perform his job of lashing the cargo at a later time after cargo was loaded in Bay 32. And any concerns of his falling would have been remedied as described by his supervisor, Mr. Perez, in his deposition and found by the trial court in its opinion. The plaintiff failed in its opposition to defend its motion to dismiss to provide the court with any evidence to support that there existed a material fact in dispute as to the essential elements as set forth by Cyndia. And as a result, the trial court was completely within its right to grant summary judgment. As this panel has pointed out on several occasions, the decision to load the cargo was purely that of the stevedores. There's been no implication that the vessel was involved in that decision whatsoever. And in fact, the evidence in this case would reflect that this activity took place during cargo reloading. This vessel was turned over to the stevedores at the time of its arrival in port for discharge. At that time, the vessel was completely covered in cargo. And as pointed out by this court, the fear of any falling didn't exist because there was cargo that covered the entire vessel. It was only after all the cargo was removed and the decision was made by the stevedores to load cargo in what's been referred to as Bay 28 that the possibility of a longshoreman working on the platform which has been described without cargo in Bay 32, which was the customary location for cargo to be first loaded, created a hazard. The appellant in this case has not contended in page 10 of its brief that the vessel had any duty whatsoever to warn in this circumstances. Without being precisely admitted, there's been no denial that this was an open and obvious condition which then requires no duty to warn. And as pointed out by the trial court in its decision, in terms of the requirement that the stevedore be able to carry on his duties without any concern for safety, the court noted that the stevedore simply could have waited until cargo was then loaded in its traditional place in Bay 32, at which point he would be able to safely access both Bay 32 and Bay 28 without any fear whatsoever of falling. This activity all occurred during the course of stevedoring operations. The only issue before this court is whether or not the defendants reached their turnover duty. And according to the teachings of Cyndia, there was no duty to warn because it was an open, obvious condition. And additionally, there were other options available to the longshoreman in terms of waiting for cargo to be loaded in the lower decks before he commenced lashing operations, which would have avoided this hazard altogether, a hazard which was created by the stevedore himself, and for which the teachings of Cyndia are quite clear, does not fall to the vessel owner as a result of the modifications to the Longshore Act of 1972. In the absence of this panel having any questions of the appellee in this regard, we would rest and ask that the lower court's summary judgment be affirmed. Thank you. This is Philip Parrish on the rebuttal. I don't know if you can hear it in the background, but there's an alarm going off in my building, but it does that from time to time, so I'm not worried that there's actually any concern. But I apologize if you can hear that. In terms of facts that were presented by Mr. Troutman, he presented testimony that he had previously told the mates on the vessel that they needed to have that railing there. That's at DE 42-1, page 7 of 11, which is page 36 of his deposition. And in paragraphs 7 and 8 of his affidavit, he stated that they regularly turned it over without that equipment, and that there was no other safety equipment readily available. He said that the stevedore's testimony on that was incorrect, so there were factual matters provided. Now, in terms of whether he should have just refused to work, even the Kirksey case recognizes an exception, which applies here. Kirksey at 396 says, Kirksey argues that he had no alternative but to unload the coils or leave the job. This is a narrow exception, which is no application here, and we have generally applied this exception where the dangerous condition existed in the ship's equipment or was otherwise created by the shipowner through its negligence. But that's what we have here. The dangerous condition existed in the failure of the ship to have the proper equipment there. And so even under Kirksey, that's an exception. So, you know, again, the Kirksey decision collapses the two turnover duties into one, such that taken to its logical extreme, if you have an open and obvious dangerous condition, then you can never have a breach of the duty to turn over the vessel without open and obvious dangers in your equipment. And the standard which applies here, the standard of care is the same as in Carroll, is do care under the circumstances. Now, the circumstances which were described in Cyndia are that these are stevedores and longshoremen, so it's not like I'm on the ship unloading it. I get that point, and I would concede that point. But we did have experienced longshoremen and stevedores at work here. The stevedore supervisor instructed, knowing that it was an open and obvious danger, instructed Mr. Troutman to unlash the upper bay first without the railing being in place. And he wants to put it on Mr. Troutman to come in and say, no, that's not safe. Well, Cyndia put no 22, and this court in Lemon say it's not an assumption of the risk. And, again, I think the court should follow the decision in Lemon versus the decision in Kirksey because it permits the second turnover duty to exist and be analyzed separately as it should be in the same fashion, I would suggest, as was analyzed last week in Carroll versus Carnival, albeit under different circumstances, but roughly the same type of essentially common law negligence principles at play, and that you analyze these under comparative negligence. And under that circumstance, the court, I think, did overlook Mr. Troutman's testimony, and this case should be reversed and remanded for either a trial or for the court to reconsider the motion under this court's decision in Lemon without applying the Kirksey case. If there are no further questions... It sounds like you're out of danger now. The alarm quit. Yeah, it did. Well, I'm relieved. Thank you for persevering even while your alarm was ringing. All right. We appreciate the presentation. All right. Thank you.